COMMONWEALTH *vs.* RICHARD O. HART
(and a companion case[1]).

No. 97-P-1103.

Hampshire. December 4, 1997. - June 16, 1998.

Present: WARNER, C.J., PERRETTA, & BECK, JJ.

*Practice, Criminal,* Motion to suppress. *Search and Seizure,* Plain view,
Threshold police inquiry.

A District Court judge incorrectly allowed criminal defendants' motions to
suppress evidence, where the record of the proceedings demonstrated that
a police officer had not improperly "seized" the defendants and that the
defendants had each discarded their contraband in plain view in the of-
ficer's presence in an area in which the officer was lawfully present. [83-86]

COMPLAINTS received and sworn to in the Northampton Divi-
sion of the District Court Department on July 8, 1996.

Motions to suppress evidence were heard by *W. Michael
Ryan*, J.

*Judith Ellen Pietras*, Assistant District Attorney, for the Com-
monwealth.

*Laurie M. Halbert* for Richard O. Hart.

*Ellen M. Lacroix* for Eric C. Guba.

PERRETTA, J. After a District Court judge allowed the
defendants' motions to suppress on the basis that each had been
"seized" without legal justification, the Commonwealth sought
and obtained leave to appeal pursuant to Mass.R.Crim.P.
15(b)(2), 378 Mass. 884 (1979). On the judge's findings of fact,
as supplemented by the uncontroverted and credible testimony
of the arresting detective,[2] we draw our own inferences, reach
our own conclusions of law (see *Commonwealth* v. *Moon*, 380

---

[1]Commonwealth vs. Eric C. Guba.

[2]The detective was the only witness at the suppression hearing. The judge
found and concluded that although his "professionalism" was "beyond
reproach," his actions were, as matter of law, without legal justification.

Mass. 751, 756 [1980]; *Commonwealth* v. *Thinh Van Cao*, 419
Mass. 383, 384, cert. denied, 515 U.S. 1146 [1995]), and reverse
the order allowing the motions to suppress.

1. *The facts.* On the night of July 5, 1996, Detective Peter
Fappiano of the Northampton police department was on duty, in
plain clothes, and driving in an unmarked police cruiser along
Hawley Street in Northampton. At about 10:40 P.M., two men,
later identified as the defendants, caught his attention. They
looked directly at Fappiano, immediately placed their hands in
their pockets, turned away from him, and quickly walked toward
8 Hawley Street, a rooming house with which Fappiano, as a
result of his numerous responses to calls from that address, was
very familiar.

Based upon his familiarity with the area and his observations
of the two men, Fappiano decided to speak with them. He got
out of his car and walked toward 8 Hawley Street. As the
defendants were walking up the steps to the entrance of the
rooming house, Fappiano called out, "Excuse me." When the
defendants turned and looked at him, he identified himself as a
police officer, displayed his badge, and asked if he could have a
moment to speak with them. The men turned, acknowledged
Fappiano, and responded to his inquiries as to whether they
resided at the rooming house. Guba told Fappiano that he did
not live at 8 Hawley Street, that he was visiting his friend Hart,
who did reside in the building, and that they had been out for a
walk and were returning to Hart's room. Although Fappiano
knew many of the residents of 8 Hawley Street, he did not
recognize Hart. As Guba and Hart were speaking with Fappi-
ano, they "kept breaking eye contact" with him and were,
instead, looking at each other and shifting from side to side.

In "midconversation," Guba turned away from Fappiano,
opened the door to the building, and entered the foyer. Fappiano
described the door as wooden and unsecured, with a large plexi-
glass window in the middle through which he had an unob-
structed view into the foyer. As Fappiano stood outside, he
could see Guba who, as he entered the building, immediately
turned to the mailboxes located in the foyer. Fappiano could
also see that those mailboxes "were partially opened and unse-
cure." He saw Guba open one of the mailboxes, reach into his
left pocket, withdraw a clenched fist, and place something in
the opened mailbox.

Upon making these observations, Fappiano entered the foyer

and asked Guba what he was doing. Guba appeared to be in a state of surprise about Fappiano's presence and did not respond to his inquiry. When Guba failed to answer, Fappiano went to the mailbox into which he had seen Guba discard something. Inside he saw three plastic baggies containing an off-white substance which, based upon his training and experience, he believed to be crack cocaine. At this point, Fappiano decided to "detain" Guba, who was now "rocking side to side," being "uncooperative," and resisting Fappiano's attempts to arrest him.

Because of Guba's resistance, Fappiano decided to leave the three baggies in the mailbox, call for assistance, and take Guba outside. Throughout the events in the foyer, Hart had remained standing on the steps outside the building.[3] Fappiano testified that as he, now outside the building, was attempting "to secure Mr. Guba properly," "Mr. Hart was appearing nervous" and "was shifting from side to side." Because of Hart's actions and for reasons of his personal safety, Fappiano asked Hart, more than once, to place his hands on the back of his head. Instead of responding to these requests, Hart, with his hands in front of him, initially turned away from Fappiano and, facing the stair railing, turned toward the adjacent parking lot. He then did as Fappiano requested.

When the officers responding to Fappiano's call for assistance arrived, Fappiano searched the area where Hart had been standing and to which he had turned after hearing the request to place his hands on his head. In the area below where he had been standing, approximately five to eight feet to the left, Fappiano found "one package consist[ent]" with the packages of cocaine retrieved from the mailbox in the foyer.

On this evidence, the judge found and concluded that Hart, because he was of African-American descent, did not feel free to walk away from Fappiano and, therefore, had been seized within the constitutional sense from the moment Fappiano requested to speak with him. The judge also found that Guba, notwithstanding a Caucasian's "history of respect for an untrampled assertion of rights," had been "seized" when Fappiano followed him into the foyer of the building situated at 8 Hawley Street.

2. *Discussion.* We treat the events in the sequence of their oc-

---

[3]There is nothing in the evidence that suggests Fappiano had directed Hart to remain on the stairs while he (Fappiano) went into the foyer.

currence and look first to Fappiano's initial contact with Hart and Guba outside the entrance to 8 Hawley Street. Citing various publications concerning the treatment of African-Americans in this country,[4] the judge stated that "[h]istorically, . . . blacks who have walked, run or raced away from inquisitive police officers have ended up beaten and battered and sometimes dead." Without reference to any of the evidence of the circumstances surrounding the encounter between Fappiano and Hart, the trial judge relied upon the data reported in the publications that he had read and concluded that Hart had been illegally seized because a "reasonable black American would not feel free to leave when stopped and questioned by police."

"[N]ot every encounter between a law enforcement official and a member of the public constitutes an intrusion of constitutional dimensions requiring justification . . . ." *Commonwealth* v. *Stoute*, 422 Mass. 782, 789 (1996). In our view, the judge created and applied an erroneous presumption of law rather than resolving the decisive issue, that is, whether the "circumstances of the encounter are sufficiently intimidating that a reasonable person would believe he was not free to turn his back on his interrogator and walk away." *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 (1991).

We have acknowledged in the past that the "average citizen questioned by the police does not necessarily feel free to walk away without responding in some manner." *Commonwealth* v. *Pimentel*, 27 Mass. App. Ct. 557, 560 (1989). However, we have never axiomatically concluded that such an inhibition on the part of the citizen results in a conclusion of law that he has been seized. Rather, we have looked to the "circumstances beyond the show of governmental authority inherent in the mere presence of the police." *Ibid.* The undisputed evidence of the circumstances in the instant case as related by Fappiano, whose actions were found by the judge to be "beyond reproach," see note 2, *supra*, shows that Fappiano, who acted alone, who was not in uniform, and who was travelling in an unmarked police vehicle, was at all times courteous, that he never displayed a weapon, that he never used language or a tone of voice indicating that either Hart's or Guba's compliance

---

[4]Specifically, the judge cited Delgado, The Coming Race War? (New York University Press, 1996); Higginbotham, In the Matter of Color (Oxford University Press, 1978); Higginbotham, Shades of Freedom (Oxford University Press, 1996); and West, Race Matters (Vintage Books, 1994).

with his requests was mandatory, and that Guba walked away from him in "midconversation" without interference. On the undisputed evidence of these circumstances, we conclude that Hart was not seized at the time of Fappiano's initial encounter with him.

We turn next to Guba who, relying upon *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981) ("[p]ursuit that appears designed to effect a stop is no less intrusive than a stop itself"), claims that Fappiano pursued him into the foyer without any basis for doing so. The evidence showed that Fappiano did not go into the common area of the foyer until *after* Guba had refused to make eye contact with him outside of the building where he had been shifting from side to side and appearing nervous, walked away from him and Hart and into the foyer of the building in which, he had stated, Hart, but not he, resided, and placed something small enough to be concealed within his fist into an unlocked and open mailbox. It was at that point that Fappiano entered the foyer, looked into the mailbox, and decided to arrest Guba.

There is nothing in the evidence which shows "pursuit in the sense that the term was used in *Thibeau*." *Commonwealth* v. *Laureano*, 411 Mass. 708, 710 (1992). In *Laureano*, two detectives, in plain clothes, went into a bar. One of them glanced at the defendant, who was about thirty feet away and engaged in conversation. "The defendant . . . abruptly terminated his conversation and hastily moved toward the men's room, ten feet away. The detectives followed, arriving at the rest room less than three seconds after the defendant. The detectives observed the defendant near a urinal, but not using it. One detective looked into the urinal, saw a small bag of white powder, and retrieved it. The defendant spun around and started to leave the rest room, whereupon he was placed under arrest." *Id.* at 709. On these facts, the court concluded that the detectives, who had not made any prior display of authority that could have been interpreted by the defendant as a restraint upon his right to walk into the men's room, had not pursued the defendant, but rather had merely followed him into a place in which they also had a right to be, where they then saw the drugs in plain view. We reach the same conclusion.[5]

We return to the issue of Hart's arrest. When Fappiano

---

[5]The judge did not consider whether Hart had a reasonable expectation of privacy in the mailbox. On the evidence and the facts found by the trial judge,

brought Guba outside, Hart was still standing on the stairs, appearing nervous and shifting from side to side. Because he became nervous for his safety, Fappiano ordered Hart to place his hands on his head. Hart choose not to heed that command and, instead, turned away from Fappiano to face the stair rail with his hands in front of him. Because Fappiano could not see Hart's hands, he made repeated demands that Hart place his hands on his head. Finally, Hart complied. When two other officers arrived at the scene, Guba was placed under arrest and Hart was brought to the bottom of the stairs. Fappiano, using a flashlight, then searched the area immediately below the stair railing to which Hart had turned when told to place his hands on his head and found another package of drugs consistent with those taken from the mailbox.

We think that Fappiano acted reasonably in ordering Hart to place his hands on his head while he, Fappiano, secured Guba until other officers arrived at the scene. See *Commonwealth* v. *Wing Ng*, 420 Mass. 236 (1995); *Commonwealth* v. *Calderon*, 43 Mass. App. Ct. 228, 230-231 (1997). Hart's response to Fappiano's reasonable command was to jettison the drugs in his possession. Once Hart did that, Fappiano, who had neither prompted nor encouraged Hart in his actions, was free to retrieve the item thrown into the lot adjacent to the stairs.

> *Order allowing motions to*
> *suppress reversed.*

we conclude that he did not. See *Commonwealth* v. *Carter*, 424 Mass. 409, 411-412 (1997).