*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 15-CF-1098

SAMUEL D. DOZIER, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-6040-14)

(Hon. Juliet J. McKenna, Trial Judge)

(Argued October 6, 2016                        Decided December 5, 2019)

*Richard P. Goldberg* for appellant.

*Danielle M. Kudla*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Richard Barker*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Senior Judge* RUIZ.

Concurring opinion by *Associate Judge* MCLEESE at page 29.

RUIZ, *Senior Judge*:  Appellant seeks reversal of his conviction for one count

of possession of cocaine with intent to distribute.  He argues that the trial court erred

in denying his motion to suppress the plastic bags of cocaine and other evidence obtained as the result of what he claims was an unlawful seizure. Specifically, appellant contends that the trial court incorrectly determined that the entirety of appellant's encounter with the police was consensual and that he voluntarily agreed to a pat-down that led to the eventual discovery of the incriminating evidence. We conclude that appellant had been seized within the meaning of the Fourth Amendment by the time he complied with the officers' request to put his hands against a wall so that the officers could pat him down. As the officers did not have reasonable, articulable suspicion to seize appellant, the pat-down was conducted in violation of the Fourth Amendment. Because the drugs and other evidence used to convict appellant were fruits of that violation, the motion to suppress should have been granted. Thus we reverse appellant's conviction and remand for further proceedings consistent with this opinion.

## I.

Metropolitan Police Department (MPD) Officer Kristopher Smith presented the government's evidence at the hearing on appellant's motion to suppress and also

testified at trial.[1]  Officer Smith testified that on the night of April 5, 2014, he and Officer Shannon Strange were assigned to a foot patrol near the 6200 block of Dix Street, N.E, an area "known for . . . soliciting prostitution and drug activity."  Officer Smith explained that his "foot beat" was "concentrate[d] on a certain area in the Sixth District for high visibility."  Two other MPD officers, Brittany Gerald and Richard Willis, gave Officers Smith and Strange a ride in a marked police vehicle to their assigned location.  All four officers were in uniform and armed.  Around 8:45 p.m., from inside the police vehicle, the officers observed appellant at the mouth of an alley on the 6200 block of Dix Street, walking out of the alley with another person.[2] Officer Smith found it "odd [that appellant] was dressed in all black clothing," and "wanted to see what was going on during that time period."  There was no one else in the vicinity.

---

[1]  In reviewing the trial court's denial of a motion to suppress, we "can consider all testimony from the suppression hearing and undisputed testimony from the trial." *Patton v. United States*, 633 A.2d 800, 818 n.11 (D.C. 1993); *see Miles v. United States*, 181 A.3d 633, 643 n.17 (D.C. 2018).  MPD Officers Brittany Gerald and Richard Willis testified at trial about the relevant events.

[2]  Officer Smith did not testify as to the identity of the other individual. However, appellant's brother, Antonio Dozier, testified at trial that he was walking with appellant from their father's house, which was within a mile of the alley.  He testified that, as they were walking, he could see the police driving toward them from about half a mile away, and that, as he and appellant were headed in different directions, they split up shortly before the officers arrived.

Upon seeing appellant, the officers drove their police vehicle to the alley. When the officers parked the vehicle,[3] its blue position lights were on, illuminating it as a police cruiser. Officer Smith testified that it was dark out, but that the alley was well lit. Appellant, now alone, was ten to fifteen feet inside the alley. Officers Smith and Strange got out of the police vehicle, and from about twenty feet away, Officer Strange asked appellant, "[h]ey, man, can I talk to you?" Appellant did not respond and "kept on walking." Both officers got closer, and when they were five to ten feet away from appellant,[4] Officer Strange again asked him, "hey, man, can I talk to you?" Officer Smith testified that Officer Strange used a "calm voice" when he asked to speak to appellant. The second time he was asked, appellant replied, "yeah, you can talk to me."

Officer Smith asked appellant whether he had "any illegal weapons on him." Appellant replied "no," and also "lifted his jacket" to show "a clean waistband." According to Officer Smith, "it was at that point that [the officers] decided to conduct

---

[3] The record is unclear as to the exact location where the police vehicle was parked. At the suppression hearing, Officer Smith testified that the car was not in the alley and stopped at the entrance of the alley, whereas at trial, he testified that the car was "all of the way into the alley." Officer Willis testified that the car "was sort of half in the alley, half out the alley." The trial court did not resolve the discrepancy. The precise location of the police car, however, is not determinative in our analysis.

[4] At trial, however, Officer Smith altered his testimony, and said that he was ten to twelve feet away from appellant.

a pat-down."[5] Officer Strange then asked appellant whether he could be patted down "for any weapons." Appellant responded, "yes, you can check me." Officer Strange asked appellant "voluntarily for his safety to place his hands on the [alley] wall," and appellant complied. Officer Strange began the pat-down, and upon reaching appellant's left ankle, felt a "bulge" inside appellant's sock that was approximately the size of a crumpled up "ball of money." Officer Strange asked appellant what the bulge was. Officer Smith, who had "grabbed" appellant's right arm, felt him "tense up,"[6] and signaled to Officers Gerald and Willis, who were still in the police cruiser, to come over to provide assistance. Appellant then "pushed off" of the wall and ran away.

---

[5] At the suppression hearing, Officer Smith explained: "I didn't see nothing that perceived to me that he had any weapon on him, so he did not have any weapons on his person at that time." At trial, however, he said that "[e]ven though he revealed his waistband, there still could be an incidence where a gun or anything else where a weapon could be hidden within his arms or what is inside his jacket pockets."

[6] The record is unclear as to exactly when Officer Smith grabbed appellant's arm. At the suppression hearing, Officer Smith testified on direct examination, "I [had appellant's] — I was holding his arm" when Officer Strange asked about the bulge in appellant's sock. However, on cross-examination, Officer Smith testified that he grabbed appellant's arm "the second" that Officer Strange asked what the bulge was. Later at trial, Officer Smith testified that "Officer Strange was in a kneeling position and Officer Strange [upon detecting the bulge] looked up and asked [appellant], what is this? And when [Officer Strange] did that, that is when I grabbed . . . [appellant's] arm." This discrepancy as to the exact moment when Officer Smith grabbed appellant's arm during the pat-down is immaterial to our analysis.

The four officers gave chase for about a minute, over one to one-and-a-half blocks. Appellant ran through the alley to a nearby Valero gas station, where the officers apprehended him. Officer Smith testified that when appellant reached the gas station, he ran toward a nearby area that was enclosed by a locked fence, and appellant had "nowhere to go." He turned to face the officers who were upon him, removed an item from his sock, and threw it over the fence. The officers recovered a plastic bag from the opposite side of the fence. It contained smaller plastic bags with a white rock-like substance that was tested and proved to be cocaine.

Appellant was charged with one count of unlawful possession with intent to distribute (PWID) cocaine, in violation of D.C. Code § 48-904.01(a)(1) (2001).[7] He moved to suppress "all tangible evidence allegedly recovered from his person," namely the drugs, as well as "[a]ll evidence of what was observed" during the encounter, including his running away from the officers and tossing an object over the fence. After a hearing, the trial court denied appellant's motion.

The trial court concluded that Officer Smith was credible, and that no other evidence contradicted his testimony. The court found that, while the government

---

[7] The statute has since been amended; the relevant provision is now at D.C. § 48-904.01(d)(1) (2019 Supp.).

offered "no evidence" that appellant had "engaged in any kind of criminal activity" when the officers initially approached him in the alley, the officers did not need justification to stop appellant because appellant's initial encounter with the police was consensual. The court determined that the government "established by a preponderance of the evidence that the officers had not engaged in any coercive or threatening behavior" — there were no weapons drawn, no commands, but only a calm request — and that appellant consented to be patted down.[8] Stating that Officer Smith had "attempted to grab [appellant's] right arm" before appellant "broke free from both officers and began to flee,"[9] the court found that appellant's encounter with the police was similar to the one considered by the Supreme Court in *California v. Hodari D.*, 499 U.S. 621 (1991), and in our subsequent cases holding that an unsuccessful attempt to detain a suspect is not a seizure. The court denied the motion to suppress, reasoning that at most there was an "attempted" seizure when the officers discovered the bulge in appellant's sock and that appellant subsequently fled and abandoned the drugs.

---

[8] The court also found that it could reasonably be inferred that appellant had not heard Officer Strange the first time he asked to speak with appellant.

[9] This was inaccurate. Officer Smith consistently testified that he had actually grabbed appellant's arm and felt it "tense up." What is not entirely clear from the record is whether the officer grabbed appellant's arm before or after appellant was asked what was in his sock. See *supra* note 6.

A three-day jury trial followed, after which appellant was found guilty on the sole count of PWID and sentenced to twenty months in prison to be followed by five years of supervised probation.  This timely appeal followed.

## II.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A constitutionally permissible encounter between a police officer and an individual can either be a "consensual encounter[], which do[es] not require any level of suspicion prior to initiation"; an "investigative detention[], which if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity prior to initiation"; or an "arrest[], which must be supported by probable cause prior to initiation."  *Gordon v. United States*, 120 A.3d 73, 78 (D.C. 2015) (footnotes omitted).  "Both investigative detentions and arrests are seizures under the Fourth Amendment; mere consensual encounters are not."  *Id.*  (footnotes omitted).  An encounter may begin consensually and, through either "the officer's show of authority or some other indication that the individual is not free to leave, become a nonconsensual seizure" that requires reasonable, articulable suspicion. *Towles v. United States*, 115 A.3d 1222, 1228 (D.C. 2015).

In determining whether a seizure occurred, this court analyzes the totality of the circumstances to determine whether "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991); *see Hooks v. United States*, 208 A.3d 741, 746 n.11 (D.C. 2019) ("Another formulation of the test asks whether a reasonable person would have felt 'free to leave,' . . . but the protections of the Fourth Amendment extend to situations where a citizen has no desire to go elsewhere and instead simply wishes to decline an encounter with the police."). The hypothetical reasonable person is an innocent person. *See Bostick*, 501 U.S. at 438. "Whether a seizure has occurred for Fourth Amendment purposes is a question of law which this court reviews *de novo*, deferring to the trial court's factual findings, unless clearly erroneous." *Jackson v. United States*, 805 A.2d 979, 985 (D.C. 2002). The trial court's determination that an encounter was consensual is a legal conclusion that a seizure did not occur, subject to *de novo* review. *See id.* at 985-86; *Sharp v. United States*, 132 A.3d 161, 166 (D.C. 2016).

Where the government contends the person agreed to a pat-down, it bears the burden to prove that "consent was, in fact, freely and voluntarily given." *Bumper v.*

*North Carolina*, 391 U.S. 543, 548 (1968); *see (Valerie M.) Brown v. United States*, 983 A.2d 1023, 1027 (D.C. 2009). Whether an individual gave consent is a factual finding that we review for clear error. *See In re J.M.*, 619 A.2d 497, 501 (D.C. 1992) (en banc). However, when "statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of unlawful detention and are thus insufficient to show consent." (*Albert*) *Jones v. United States*, 154 A.3d 591, 598 n.20 (D.C. 2017) (quoting *McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993)); *see Hicks v. United States*, 705 A.2d 636, 641 (D.C. 1997).

"Generally, when physical or testimonial evidence is uncovered by an illegal search or seizure, it must be suppressed as the 'fruit of the poisonous tree.'" *Wilson v. United States*, 102 A.3d 751, 753 (D.C. 2014) (citation omitted).[10] "The test is whether the evidence in question 'has been come at by exploitation of [the primary] illegality or instead by means sufficiently distinguishable to be purged of the primary

[10] Admission of "fruits" has been permitted in some cases involving warrants that are later ruled invalid or recalled, where the purposes of the exclusionary rule would not be undermined because the conduct that violated the defendant's rights was not "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Blair v. United States*, 114 A.3d 960, 972 (D.C. 2015) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2004)).

taint.'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). The government has the burden of proving that "an intervening event or other attenuating circumstance purged the taint of the initial illegality so as to obviate suppression." *Robinson v. United States*, 76 A.3d 329, 342 n.27 (D.C. 2013) (brackets, citation, and internal quotation marks omitted).

## III.

The government concedes that there was no reasonable, articulable suspicion that appellant was engaging in criminal activity when the officers saw him at the mouth of the alley and decided to question him.[11] Instead, the government contends that the officers initially engaged appellant in a consensual encounter that did "not require any level of suspicion prior to initiation," *Gordon*, 120 A.3d at 78, and that the interaction continued in the same vein, with appellant voluntarily agreeing to the pat-down. In support, the government argues that the officers did not say or do anything to convey to appellant that he was not free to leave or refuse the encounter; rather, they simply walked up, asked a few questions in a "normal" tone of voice, and

---

[11] Indeed, Officer Smith's stated reason for his suspicions of appellant, that he was dressed all in black, without more, was clearly inadequate under the Fourth Amendment.

did not take any action that amounted to a show of force or that was otherwise intimidating.

We disagree with the government's portrayal of appellant's encounter with the police as entirely consensual. Applying the well-established legal principles outlined above in a totality-of-the-circumstances analysis, we conclude that even assuming that the officers' interaction with appellant began in a consensual manner, there was a Fourth Amendment seizure by the time appellant submitted to the officers' request to a pat-down. An innocent person in appellant's situation, we believe, would not have felt free to decline that request after he had been approached by two uniformed and armed police officers who engaged in repeated questioning and escalating requests, culminating with a request to put his hands on the wall for a pat-down, at a time when he was alone, at night, in a secluded alley partially blocked by a police cruiser with two additional officers standing by. "The message that a suspect is not free to leave or terminate [an encounter] can be conveyed, not necessarily intentionally, in ways less obvious than actual physical force or [an] explicit command." (*Albert*) *Jones*, 154 A.3d at 595.

In coming to this conclusion, we have reviewed our recent analysis in (*Albert*) *Jones*. 154 A.3d at 594-98. In that case, two officers were on patrol in a marked

police car during the day in an area known for "a high volume of drug sales." *Id.* at 593. While driving through an alley they spotted Jones, who was walking out of the alley, holding a Newport cigarette box in his hand. *Id.* at 592-93, 595-96. As the officers passed Jones, the officer driving the car rolled down his window and casually greeted Jones. *Id.* at 593. The officer, who was visibly armed and in uniform, then got out of the car, and, noticing that Jones tried to hide the cigarette box behind his back, asked Jones for his name, date of birth, and address, which Jones provided. *Id.* The officer then asked to see the cigarette box, which turned out to contain contraband. *Id.* The officer used a cordial tone of voice throughout and the encounter was short, lasting only a minute or two. *Id.* at 595.

We started our analysis by recognizing that when a "visibly armed police officer in full uniform and tactical vest emerges without warning from a police cruiser to interrupt a person going about his private business," the encounter is not "between equals." *Id.* at 595. In addition, we noted that where "questioning is at least implicitly accusatory (if not explicitly so), a reasonable person's reaction is not only to show respect for the officer's authority, but also to feel vulnerable and apprehensive." *Id.* at 596. "In such an atmosphere," we remarked, "a reasonable person who can tell from the inquiries that the officer suspects him of something, and who cannot know whether the officer thinks there is sufficient reason to detain him,

may well doubt that the officer would allow him to avoid or terminate the encounter and just walk away." *Id.* Although these circumstances in *Jones* were not by themselves sufficient to constitute a seizure, we went on to consider two additional factors that, when combined with the contextual circumstances, rendered the encounter with the police a seizure within the meaning of the Fourth Amendment. *See id.*

First, Jones's freedom of movement was limited because the police vehicle was occupying the middle of a very narrow alley and, when the officer stepped outside the car, he partially obstructed Jones's way between the vehicle and the alley wall. *Id.* Although it would have been possible for Jones to squeeze past the officer or turn around and leave the alley in the opposite direction, the circumstances "substantially reduced the ease with which [Jones] could have walked on or otherwise avoided the encounter." *Id.* at 597. This helped "to convey the message to a reasonable person in [Jones's] position that he was not free to disregard the police and go about his business." *Id.* Second, the officers ran a check for outstanding arrest warrants, which would send a strong signal to a reasonable innocent person that his liberty would be restrained while the check was in progress. *Id.* We concluded that, viewing the circumstances as a whole, Jones's encounter with the police was a seizure within the meaning of the Fourth Amendment. *Id*. at 598.

As in (*Albert*) *Jones*, we begin our analysis in this case by recognizing the apprehensiveness that would naturally be felt by a person unexpectedly accosted by police officers insistently asking questions in appellant's situation. The setting in this case had several indicia that made it particularly intimidating. As we commented in (*Albert*) *Jones*, an encounter is "more intimidating if the person is by himself, if more than one officer is present, or if the encounter occurs in a location that is secluded or out of public sight." *Id.* at 597. Appellant's encounter occurred at night, in a secluded alley where he was alone, and four officers were involved. The alley was enclosed on both sides by brick walls, and no passersby could see into the alley unless they were right at the entrance of one end or the other.

Moreover, there were other signs that would have conveyed that appellant would not be able to avoid the officers' interest in questioning him. The police went to where appellant was walking out of the alley and parked the patrol car at the entrance to the alley. Two armed and uniformed officers got out of the car, walking closer to appellant as they called out to him, while two other officers remained standing by in the police car. They persisted even after appellant initially did not respond and continued on his way. The officers came closer, within five to twelve feet of appellant, and again asked to speak with him. Thus, by a certain point, the

officers signaled that this was not a chance encounter but one directed specifically at appellant. *See United States v.* (*Frederick*) *Jones*, 678 F.3d 293, 300 (4th Cir. 2012) ("a traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer") (citing *Bostick*, 501 U.S. at 434)); *cf.* (*Albert*) *Jones*, 154 A.3d at 593 (two officers happened upon Jones as they were driving through an alley during the day; one officer asked Jones questions, first while still seated inside the car, and then got out of the car).

We note other factors, not discussed in (*Albert*) *Jones*, that we think are relevant in evaluating the coercive character of the overall setting of the encounter: that it took place in a "high crime area"[12] and involved an African-American man. Officer Smith testified that the 6200 block of Dix Street was "known for" prostitution

---

[12] The Supreme Court first used the term "high-crime area" in 1972, but has never defined exactly what constitutes such an area. *See* Andrew G. Ferguson & Damien Bernache, *The "High-Crime Area" Question: Requiring Verifiable & Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis*, 57 Am. U.L. Rev. 1587, 1590 & nn.1-2 (2008) (citing *Adams v. Williams*, 407 U.S. 143, 147-48 (1972), and *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). The Supreme Court, as well as this court, has recognized that the occurrence of an investigative stop in a high-crime area can be a relevant contextual consideration in evaluating whether the police had reasonable, articulable suspicion to effect a stop under the Fourth Amendment. *See Miles*, 181 A.3d at 640. We have cautioned against over-reliance on this amorphous term to support reasonable, articulable suspicion to effect a seizure, given that residents of certain neighborhoods in the District of Columbia may be more likely to be suspected of engaging in criminal activity simply because of where they live or frequent. *See Henson v. United States*, 55 A.3d 859, 871-72 (D.C. 2012) (Blackburne-Rigsby, J., concurring).

and drug activity and was "fairly plagued with numerous complaints" of such incidents. He testified that the police paid "special attention" to that area, with "numerous assignments" to officers to patrol that area, and that he and Officer Strange were assigned to a foot patrol "for high visibility." Considering that the police frequently and visibly patrolled the area for criminal activity, it is to be expected that a person in the area would be aware that police officers in the area expected to find criminal activity there. Against that awareness, the officers' repeated questioning and escalating requests would have felt even more pointed and coercive. *See* (*Frederick*) *Jones*, 678 F.3d at 304 ("[T]he totality of the circumstances would suggest to a reasonable person in Jones's position that the officers suspected him of some sort of illegal activity in a 'high crime area,' which, in turn, would convey that he was a target of a criminal investigation and thus not free to leave or terminate the encounter.").

By making this common-sense observation we do not retreat from the well-established proposition that the Fourth Amendment is not implicated simply because "a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434. As the Supreme Court has explained, just as police are at liberty (as is any other person) to ask questions, so the person approached by police has "an equal right to ignore his interrogator and walk away." *United States v. Mendenhall*, 446

U.S. 544, 553 (1980). This does not mean, however, that a Fourth Amendment seizure takes place any time a person would feel some pressure to respond to an officer's questions and requests. *See Lawrence v. United States*, 566 A.2d 57, 60 (D.C. 1989). As we recognized in (*Albert*) *Jones*, although there is an inherent inequality and vulnerability in most encounters with police, the Fourth Amendment calculus tolerates a measure of official pressure in exchange for needed cooperation from the public with police activities in safeguarding safety and assisting with law enforcement. *See* 154 A.3d at 596 n.15 ("The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.") (quoting *Mendenhall*, 446 U.S. at 553-54)). The question is how much and what kind of pressure will tip that calibrated balance from the type of encounter an ordered society encourages to one that infringes too much into the private space the Fourth Amendment protects from unjustified government intrusion.

We think it is evident that the pressure a person might feel to cooperate as part of his civic responsibility is by its nature different from the pressure felt by a person who thinks he might be suspected of criminal activity. Being innocent is not the same as being perceived to be innocent. Even the innocent person we posit in our

Fourth Amendment analysis might well fear that he is perceived with particular suspicion by hyper-vigilant police officers expecting to find criminal activity in a particular area.

This fear is particularly justified for persons of color, who are more likely to be subjected to this type of police surveillance.[13]  As is known from well-publicized and documented examples, an African-American man facing armed policemen would reasonably be especially apprehensive.[14]  The fear of harm and resulting protective conditioning to submit to avoid harm at the hands of police is relevant to whether there was a seizure because feeling "free" to leave or terminate an encounter with police officers is rooted in an assessment of the consequences of doing so.[15]  A

_____

[13]  The Metropolitan Police Department recently released a report with a one-month snapshot of statistics on stops throughout the District of Columbia.  According to the Stop Data Report, 70% of stops in the District of Columbia involved African Americans; the number increases to 86% if vehicle stops are excluded; 46% of District residents are African American.  *See* Metropolitan Police Department, Washington, D.C., Stop Data Report at 9, 19 (Sept. 9, 2019), available at https://mpdc.dc.gov/stopdata https://perma.cc/RJ59-RD2M (last visited Dec. 4, 2019).

[14]  *See* Devon Carbado, "Blue-on-Black Violence:  A Provisional Model of Some of the Causes," 104 Geo. L.J. 1479, 1480 (2016).

[15]  It is worth noting that

> [t]his case involves a suspicionless stop, one in which the
> officer initiated this chain of events without justification. As

(continued . . . )

person who reasonably is apprehensive that walking away, ignoring police presence, or refusing to answer police questions or requests might lead to detention and, possibly, more aggressive police action, is not truly free to exercise a constitutional prerogative — "to be secure in their persons," even if they do not submit — in the same manner as a person who is not viewed with similar suspicion by police and, as a result, largely unafraid of triggering an aggressive reaction.[16] We cannot turn a blind

_____

( . . . continued)

> the Justice Department notes, . . . many innocent people are subjected to the humiliations of these unconstitutional searches. . . . But it is no secret that people of color are disproportionate victims of this type of scrutiny. . . . For generations, black and brown parents have given their children "the talk" — instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger — all out of fear of how an officer with a gun will react to them.

*Utah v. Strieff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting) (internal citations omitted).

[16] The Council of the District of Columbia and the Metropolitan Police Department, aware of the tensions surrounding police use of force in conducting stops and searches, have taken steps to enhance police accountability and build the community's trust in policing activities. The NEAR Act, enacted in 2016, adopted a number of reforms to address these tensions, including making misdemeanor assault on a police officer a jury-demandable offense. D.C. Code § 22-405 (b) (2018 Supp.); D.C. Code § 16-705 (b)(1) (2012 Repl.).

The "troubling findings" that led the Council to adopt these changes were that:

- Ninety percent of those charged with APO were black, although black residents comprise only half of the District's population.

(continued . . . )

- Nearly two-thirds of those arrested for APO were not charged with any other crime, raising questions about whether police had legal justification to stop the individual.
- Approximately 1 in 4 individuals charged with a misdemeanor for APO required medical attention after their arrest, a higher rate than the 1 in 5 officers reporting injury from the interactions.
- The District uses the charge of APO almost three times as much as cities of comparable size, according to a 2013 FBI report and MPD numbers.
- Prosecutors declined to press charges in more than 40 percent of the arrests for assaulting a police officer.

"Neighborhood Engagement Achieves Results Amendment Act of 2016", D.C. Council, Report on Bill 21-0360 at 11 (Jan. 27, 2016).

Earlier that year, the Council endorsed the MPD's Body-Worn Camera Program. D.C. Code §§ 5-116.31-.33, 5-116.51. The Committee Report set out an overview of the serious problem it sought to address: "Public perception of policing is at a low point. Grand gestures are not going to change that perception; police are going to need to restore trust one interaction at a time." (quoting oral testimony of then-MPD Chief Cathy Lanier). "Body-Worn Camera Amendment Act of 2015", D.C. Council, Report on Bill 21-0351 at 6 (Nov. 19, 2015).

In her testimony, Chief Lanier explained the MPD's reasons for adopting body-worn cameras:

> We began exploring body-worn cameras before many of the recent high-profile incidents around the country heightened national attention on police accountability. These events have intensified the frustration and lack of trust that some in the community have with police. There is no easy solution to resolve these difficult issues, but body cameras could improve the climate by providing a better record of police interactions with individuals from start to finish. Other agencies have reported that police

(continued . . . )

eye to the reality that not all encounters with the police proceed from the same footing, but are based on experiences and expectations, including stereotypical impressions, on both sides.  Our job in this case is not to judge their truth or validity but to recognize they exist and take them into account in light of "[o]ur precedents [which] direct [us to] take an 'earthy' and realistic approach to such street encounters." (*Albert*) *Jones*, 154 A.3d at 596 (quoting *Jackson v. United States*, 805 A.2d 979, 988 (D.C. 2002)).  In view of the intimidating factors and the corresponding sense of vulnerability, a reasonable person in appellant's situation "may well doubt that the officer would allow him to avoid or terminate the encounter and just walk away." (*Albert*) *Jones*, 154 A.3d at 596.  In the isolated setting where the encounter took place, appellant, who is African-American, reasonably could have feared that unless he complied with the police requests, he would be vulnerable to police violence, without hope that anyone would come to his aid or witness what happened.

_____
( . . . continued)

    use of force and citizen complaints have significantly decreased with the deployment of the cameras.  Given the expected benefits, more and more departments are launching BWC programs.  Body-worn cameras may be an important step in restoring public trust in law enforcement.

*Id*. at 11.

We also note additional circumstances present in appellant's encounter with the police that "materially increased its coerciveness." *Id.* Appellant's freedom of movement was "restrained" by the officers' "show of authority." *Mendenhall*, 446 U.S. at 552. As two officers, in uniform and armed, were closing on appellant in a secluded alley and calling to him, two other officers were waiting in a police cruiser parked at the egress point of the alley toward which appellant had been walking. *Cf. id.* at 555 (no seizure where events took place in a "public concourse" in an airport, and federal agents, who identified themselves, wore no uniform and displayed no weapons). Even though appellant could, in theory, have walked past both sets of officers (and compared to (*Albert*) *Jones*, appellant had more room to do so), the greater number of officers and their positioning created an intimidating environment that psychologically, if not physically, "substantially reduced" the ease with which appellant could have avoided the police. (*Albert*) *Jones*, 154 A.3d at 597. We think it highly unlikely that a person in appellant's situation would reasonably have entertained the prospect of continuing to walk away in that scenario — between two sets of officers who had made clear their intentions to engage with him — and felt free to disregard the police presence and go about his business.

And although here the officers did not run a warrant check as in (*Albert*) *Jones*, the officers comparably signaled that appellant would not be allowed to leave until

they finished the investigation they had set in motion. When Officer Smith first asked if appellant had illegal weapons on him, appellant responded "no." He then lifted his jacket to show that he was not armed. Despite appellant's two responses to the officers' questions, Officer Strange continued to investigate, asking appellant whether he could be patted down "for any weapons," and then requesting that appellant "place his hands on the [alley] wall." By insisting on increasingly intrusive measures, notwithstanding appellant's verbal response and additional action (showing a clean waistband) that answered the officers' stated concern about illegal weapons, the officers made clear that they were dissatisfied with appellant's compliant responses, and that they would continue to investigate until they could confirm or dispel their suspicions about appellant by conducting a pat-down. *See* (*Albert*) *Jones*, 154 A.3d at 597 (noting that the significance of a warrant check is not necessarily its duration but that it "sends a strong signal to a reasonable person that the officer will not allow him to leave while the inquiry is in progress precisely because the outcome of the inquiry may necessitate that person's detention"); (*Valerie M.*) *Brown*, 983 A.2d at 1026 (explaining that "repeated questioning of a defendant can cause an encounter to lose 'its consensual nature' if the police officers' questions or actions 'convey a message that compliance with their requests is required[]'") (quoting *Hawkins v. United States*, 663 A.2d 1221, 1226 n.20 (D.C. 1995)).[17]

---

[17] We are unpersuaded by the government's argument that the officers'

(continued . . . )

The government and the trial court relied on the fact that the officers made "requests" and did so in conversational tones, without orders, shouting, or threats. These are factors to be considered but they do not necessarily counter a reasonable person's perception of the coercive nature of the interaction with the police. *See Guadalupe v. United States*, 585 A.2d 1348, 1361 (D.C. 1991) (noting that an "officer's questioning d[oes] not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere"; rather, the same shift would happen when the officers' conduct shows that they would "continue to follow and ask additional questions"). The age-old adage that "actions speak louder than words" rings true here: a police officer making a "request" of a civilian may in some circumstances present a choice, but in this case the message came

_____

( . . . continued)

questioning of appellant was similar to that in *Brown*, where we concluded that Brown's encounter with the police did not amount to a Fourth Amendment seizure. 983 A.2d at 1026. In *Brown*, two armed and uniformed police officers approached a group of five or six men standing on the sidewalk. *Id.* at 1025. One officer spoke with two of the men, while the other officer asked Brown a question ("Do you have any guns, drugs, or narcotics on you?") in a "normal tone" of voice "without making any threatening gesture," and repeated the question after receiving a non-responsive answer. *Id.* In this case, appellant was alone in an alley, more officers were involved, the officers' questions were more numerous, and their requests more intrusive, than in *Brown*. The officers here asked a second time to speak to appellant, after he did not respond the first time. This would be equivalent to the repeated question in *Brown*. But in addition, here the officers continued to ask appellant to pat him down for illegal weapons even though appellant had already given a responsive verbal reply ("no") and lifted his jacket to show that he was not armed.

through that appellant was not free to decline the request for a pat-down or terminate the encounter. Words and actions can reasonably be perceived differently depending on the surroundings, which provide important context. As we have already discussed, the physical location and time of the encounter (a secluded alley at night) can have a bearing on its coerciveness, a person's freedom to avoid the encounter can be affected by the number of officers involved and their positioning, and a person's freedom to refuse to engage or answer can be diminished by the perceived level of police suspicion, as shown by persistent questioning, or by reasonable apprehension about triggering aggressive police actions if the person is in a neighborhood or belongs to a group routinely targeted by police.

We emphasize that we consider the factors we have identified "as a whole, under the totality of the circumstances, rather than in isolation." *Jackson*, 805 A.2d at 987. No single circumstance in this case was by itself sufficient, nor were all necessary to amount to a seizure. Although we compare to other cases for guidance, we decide each case on its own, considering all relevant facts. In this case, we conclude that appellant was seized within the meaning of the Fourth Amendment by the time he complied with the officers' request to put his hands on the alley wall so

that they could pat him down.[18]   Because there was no reasonable, articulable

suspicion that he was engaged in  criminal activity prior to that time, the seizure  was

unlawful.[19]   Applying the exclusionary rule, we conclude that the drug evidence, as

well as the officers' testimony about appellant's flight and throwing motion, should

have been suppressed as the fruits of an illegal seizure.[20]   *See* (*Albert*) *Jones*, 154

---

[18]   Assuming that, as the trial court found, appellant agreed to the pat-down, it would have been contemporaneous with and tainted by the illegal seizure, and "thus insufficient to show consent." (*Albert*) *Jones*, 154 A.3d at 598 n.20.

[19]   The government's brief argues, in a footnote, that in a high-crime area, the officers had justification to stop appellant at the moment they felt his arm "tense up" when asked about the bulge in his sock.  As we explain in the text, appellant had already been seized by then, so even assuming that the argument has merit (an issue which we do not decide), the justification would have come after appellant was seized.

At oral argument the government argued, for the first time, that even if appellant had been seized, appellant's running away ended the "attempted seizure," and therefore facts observed by the officers during and after the pat-down could be taken into account in determining whether they had reasonable articulable suspicion, citing *Henson*, 55 A.3d at 867-68.  We need not consider this argument because issues raised for the first time at oral argument are normally deemed waived. *See Ramos v. United States*, 569 A.2d 158, 162 n.5 (D.C. 1990).  In any event, our conclusion that appellant was seized is not based on a physical seizure of his person, the question at issue in *Henson*, but on his submission to a police pat-down in a situation that, viewed in its totality, conveyed to a reasonable person that he was not free to leave.

[20]   The government argued that because appellant abandoned the drugs by tossing them as he tried to run away, he no longer had a reasonable expectation of privacy and therefore lacked standing to raise a Fourth Amendment challenge.  We reject that argument because when he submitted to the pat-down appellant had the drugs secreted on his person, and therefore had an expectation of privacy at the time

(continued . . . )

A.3d at 598.  Accordingly, we reverse appellant's conviction and remand the case for further proceedings consistent with this opinion.


*Reversed and remanded.*

_____

( . . . continued)

of the illegal seizure.  The evidence must be excluded as the government has not shown that there was an independent, intervening event that purged the taint of the unlawful seizure.  *See Robinson*, 76 A.3d at 342 n.27.  Here, the undisputed evidence is that appellant discarded the drugs he had been safeguarding in his sock within a minute or two after he broke free from the unlawful seizure just as he was about to be caught by the officers who were chasing him.  *See* (*Donald*) *Brown v. United States*, 97 A.3d 92, 97 n.5 (D.C. 2014) ("In order to be effective, abandonment must be voluntary.  It is considered involuntary if it results from a violation of the Fourth Amendment . . . .  [P]roperty is considered to have been involuntarily abandoned if the defendant discards it as a consequence of illegal police conduct.")  The government has not argued that the exclusionary rule should not be applied in this case because the officers' conduct was not sufficiently deliberate or culpable to warrant the sanction; nor would we see any basis, in the case of a suspicionless, warrantless seizure, for an argument to depart from the general rule of exclusion of the fruits of conduct that violates the Fourth Amendment.  *See Herring*, 555 U.S. at 146 (noting that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on" warrants that are subsequently invalidated or recalled "cannot justify the substantial costs of exclusion" (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).

MCLEESE, *Associate Judge*, concurring in the judgment: I agree with the court that (1) Mr. Dozier was seized by the time he complied with the officers' request that he put his hands against a wall so that he could be patted down, (2) that seizure was not justified by articulable suspicion, (3) the evidence at issue should have been suppressed, and (4) Mr. Dozier's conviction should be reversed. I therefore concur in the judgment. I do not join the opinion of the court, however, because that opinion decides an important issue of Fourth Amendment law that is not properly before the court.

In determining when Mr. Dozier was seized, the court holds that it is relevant that Mr. Dozier is African-American man who would have known that the location of the encounter was patrolled by "hyper-vigilant police officers expecting to find criminal activity." *Supra* at 16, 18. For numerous reasons, however, the court errs in its treatment of this issue.

1. Most fundamentally, the record does not support the court's factual premises. As the court notes, *supra* at 2 n.1, we may consider in our review "all testimony from the suppression hearing and undisputed testimony from the trial." *Patton v. United States*, 633 A.2d 800, 818 n.11 (D.C. 1993); *see Miles v. United*

*States*, 181 A.3d 633, 643 n.17 (D.C. 2018). As the court also notes, *supra* at 3, 16, there was evidence that the 6200 block of Dix Street NE was a high-crime area given special attention by the police. There was no evidence, however, that the manner of that special attention was "hyper-vigilant" or would have led a reasonable person familiar with that block to be unusually fearful of a police encounter in that block.

Moreover, the evidence does not support the conclusion that Mr. Dozier would have been familiar with the police's special attention to that block. The court asserts that "it is to be expected that a person in the area would be aware that police officers in the area expect to find criminal activity there." *Supra* at 16-17. To the contrary, it does not seem to me reasonable to infer that Mr. Dozier would be familiar with police enforcement activities in an area simply because he was walking in the area.

Even if a factfinder could reasonably have drawn such an inference, however, and thus could possibly have found as a matter of fact that Mr. Dozier was aware of the police activities in the 6200 block of Dix Street, appellate judges are not factfinders. *See, e.g.*, *Evans v. United States*, 122 A.3d 876, 884 (D.C. 2015) ("[I]t is not our function to decide issues of fact."); *V.C.B. v. United States*, 37 A.3d 286, 291 (D.C. 2012) ("It is incumbent upon us, in this case as in any other, to eschew appellate fact-finding and to avoid usurping the function of the trial court.") (citation

and internal quotation marks omitted). The court therefore acts outside its authority in inferring such awareness on Mr. Dozier's part.

Finally, as far as I can tell, there was no evidence, either at the suppression hearing or at trial, as to Mr. Dozier's race. There do appear to be court-created forms in the trial-court electronic case file referring to Mr. Dozier as "Black," but I am doubtful that this court can appropriately rely on those forms in the current context.

2. Even if there were an adequate factual basis for the court's analysis, many other fundamental principles of appellate adjudication counsel against deciding in this case whether a suspect's race and past experiences with, or beliefs about, law enforcement are relevant to whether a police encounter with the suspect was a seizure. First, that issue was not raised in the trial court. *See, e.g.*, *In re D.A.J.*, 694 A.2d 860, 863-64 (D.C. 1997) (court ordinarily does not consider arguments, including Fourth Amendment arguments, not raised in trial court). Second, the trial court did not decide the issue. *See, e.g.*, *id.* at 864 ("We have consistently declined to rule on issues never addressed by the trial court."). Third, the parties did not brief the issue in this court. *See, e.g.*, *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 147 n.10 (2011) ("It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties . . . ."). Fourth,

deciding that issue is not necessary to resolve this case, because the police conduct at issue was a seizure without regard to Mr. Dozier's race and past experiences with, or beliefs about, law enforcement. *Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 592 n.5 (1993) (dicta that are "uninvited, unargued, and unnecessary to the Court's holdings" are inconsistent with doctrine of judicial restraint). Fifth, the issue is constitutional in character, which triggers a heightened interest in avoiding an unnecessary ruling. *See, e.g.*, *Gamble v. United States*, 30 A.3d 161, 167 n.11 (D.C. 2011) ("The practice of avoiding constitutional issues if it is reasonably possible to do so is predicated on a fundamental rule of judicial restraint, which is perhaps more deeply rooted than any other doctrine of constitutional adjudication.") (internal quotation marks omitted). Sixth, as I will explain, the issue is important and the court's resolution of the issue is certainly not free from doubt. *See, e.g.*, *United States v. Adams*, 740 F.3d 40, 43 (1st Cir. 2014) ("This prudential approach makes eminently good sense: . . . discretion is often the better part of valor, and courts should not rush to decide unsettled legal issues that can easily be avoided.") (brackets and internal quotation marks omitted).

3. For the foregoing reasons, the court should not be deciding in this case whether a suspect's race and past experiences with, or beliefs about, law enforcement are relevant to whether a police encounter with the suspect was a seizure. If the court

is going to decide the question, however, the court should explain its reasoning and address relevant legal authority on the topic. The court does not do that, however, instead simply assuming that it is appropriate to consider a suspect's race and past experiences with, or beliefs about, law enforcement in the seizure analysis. *Supra* at 16-22. I do not view that as at all clear.

As the court notes, *supra* at 9, whether there was a sufficient display of authority to constitute a seizure turns on whether "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). Both the Supreme Court and this court have indicated that this is a totality-of-the circumstances test. *E.g.*, *id.* at 437; *Hooks v. United States*, 208 A.3d 741, 746 (D.C. 2019). Both courts have also indicated, however, that the test is an objective one. *E.g.*, *United States v. Drayton*, 536 U.S. 194, 202 (2002); *Jackson v. United States*, 805 A.2d 979, 987 (D.C. 2002).

In explaining the advantages of the objective reasonable-person test, the Supreme Court has explained that that test

> calls for consistent application from one police encounter to
> the next, regardless of the particular individual's response

> to the actions of the police. The test's objective standard—looking to the reasonable [person's] interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. 3 W. LaFave, Search and Seizure § 9.2(h), pp. 407–408 (2d ed. 1987 and Supp. 1988). This "reasonable person" standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.

*Michigan v. Chesternut*, 486 U.S. 567, 574 (1988).

Relying on this passage from *Chesternut*, this court has at a minimum cast doubt on the idea that a suspect's presence in a high-crime area should be taken into account in determining whether the suspect was seized. *Lawrence v. United States*, 566 A.2d 57, 61-63 (D.C. 1989) (noting empirical research that, in high-crime areas, people stop and answer police questions for reasons including fear of the police, but indicating that, under Supreme Court case law, such observations "cannot affect the result"). Relatedly, this court has held that a fourteen-year-old suspect's age was not relevant in determining whether police conduct amounted to a seizure. *In re J.M.*, 619 A.2d 497, 501 (D.C. 1992) (en banc).

Other courts have reached similar conclusions. *See, e.g.*, *United States v. Lozano*, 916 F.3d 726, 730 (8th Cir. 2019) (seventeen-year-old suspect's age not properly treated as relevant to whether police conduct amounted to seizure); *Monroe*

*v. City of Charlottesville, Va.*, 579 F.3d 380, 386-87 (4th Cir. 2009) (trial court correctly concluded that plaintiff's past experiences with police and "the state of relations between law enforcement and members of minority communities" were irrelevant to whether plaintiff was seized) (brackets and internal quotation marks omitted); *United States v. Hill*, 199 F.3d 1143, 1149 (10th Cir. 1999) (at least where officer is unaware of past experiences at issue, suspect's past negative experiences with police are not relevant to whether suspect was seized); *Commonwealth v. Hart*, 695 N.E.2d 226, 228-29 (Mass. App. Ct. 1998) (trial court erred by finding seizure based on data in publications that led trial court to conclude that "reasonable black American[s] would not feel free to leave when stopped and questioned by police") (internal quotation marks omitted).

I do not mean by the foregoing to express a definite view on the question whether, and if so in what circumstances, a suspect's race and past experiences with, or beliefs about, law enforcement are relevant in deciding whether a police encounter with the suspect was a seizure. There are countervailing arguments and authority. A suspect's past experiences with, and beliefs about, law enforcement doubtless would have a substantial effect on the suspect's reasonable beliefs about whether the suspect is free to terminate an encounter with the police. Moreover, the past experiences and beliefs of suspects doubtless vary significantly based on factors such as race,

socioeconomic status, and the neighborhoods in which the suspects live and work. Finally, the relevant legal authority on the question is not one-sided. *See, e.g.*, *United States v. Washington*, 490 F.3d 765, 773 (9th Cir. 2007) (in deciding whether police conduct was seizure, court takes into account "publicized shootings by white Portland police officers of African–Americans"); *Hunt ex rel. DeSombre v. State*, 69 A.3d 360, 366 (Del. 2013) (taking age of eight-year-old suspect into account in determining whether suspect was seized); 4 Wayne R. LaFave, *Search and Seizure* § 9.4(a), at 572 (5th ed. 2012) (after extensive discussion of issue, predicting that Supreme Court would hold that "th[e] 'reasonable person' test requires consideration of some known unique characteristics of the suspect (e.g., . . . youth)").

4. It may be that there are reasonable responses to the concerns raised in this concurrence. The opinion for the court does not address those concerns, however, so we do not know what those reasonable responses might be. We therefore do not know why the court believes that it is permissible to base its Fourth Amendment holding on the unsupported inference that Mr. Dozier would have been expecting "hyper-vigilant" police enforcement in the block where he was walking; why the court believes that it is free to draw factual inferences on appeal, as though it were a factfinder; and why the court believes that it is appropriate to resolve an important and unsettled question of Fourth Amendment law that is unnecessary to the

disposition of the case and was not raised in the trial court, decided by the trial court, or briefed by the parties on appeal.

On the merits, we do not know why the court believes that it is permissible to consider Mr. Dozier's purported beliefs about the nature of law-enforcement activity in the area of the incident. Does the court believe that Mr. Dozier's particular state of mind may be considered in the seizure analysis, even if that state of mind was not known by the officers? If so, how does the court square that approach with the Supreme Court's statement in *Chesternut* that "the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached"? 486 U.S. at 574. We do not know the answers to these questions, because the court has not explained its thinking.

5. For the foregoing reasons, I cannot join the court's opinion. I respectfully concur in the judgment.